**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HARRY EDELSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 C 7320 |
| | ) | |
| RAYMOND K.F. CH'IEN, PETER YIP | ) | |
| HAK YUNG, ASIA PACIFIC ONLINE LTD., | ) | |
| and CHINADOTCOM CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Harry Edelson ("Edelson") brought suit against Defendants Chinadotcom Corporation ("CDC"), Raymond K.F. Ch'ien ("Ch'ien"), Peter Yip Hak Yung ("Yip"), and Asia Pacific Online Ltd. alleging that Defendants were liable under (1) Section 13(d) of the Securities Exchange Act and (2) a state law theory of tortious interference with a prospective economic advantage. The Court has dismissed all but Plaintiff's tortious interference claim against CDC. *Edelson v. Ch'ien*, No. 03 C 7320, 2004 WL 422674, *1 (N.D. Ill. Jan 28, 2004), *aff'd* 405 F.3d 620 (7th Cir. 2005); *Edelson v. Ch'ien*, 352 F. Supp. 2d 861 (N.D. Ill. 2005). Currently before the Court is CDC's motion for summary judgment (the "Motion") on that claim. For the reasons below, the Court grants CDC's Motion.

## ANALYSIS

### I.     Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining whether a genuine issue of material fact exists, the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Id.* at 255. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed.2d 265 (1986). The existence of a factual dispute is not sufficient to defeat a summary judgment motion, instead the non-moving party must present definite, competent evidence to rebut the summary judgment motion. *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).

When resolving summary judgment motions, a court may consider affidavits submitted by the parties, but "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). "Thus, statements outside the affiant's personal knowledge or statements that are the result of speculation or conjecture or merely conclusory do not meet [the] requirement of [Rule 56(e)]." *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); *Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("[a]lthough 'personal knowledge' may include inferences and opinions, those inferences must be substantiated by specific facts."). With these standards in mind, the Court turns to the merits of CDC's Motion.

## II.     Facts

### A.     The Parties

Plaintiff Harry Edelson is a citizen of New Jersey and a former outside, independent non-management director of CDC.  (R. 96-1, Def.'s Stmt. of Material Facts ("SMF") at ¶1.) Defendant CDC is a corporation formed and existing under the laws of the Cayman Islands, with its principal place of business in Hong Kong.  (*Id.* at ¶2.)  CDC is an integrated enterprise solutions company offering software services and outsourcing, technology, marketing and media services and content for companies and end users throughout greater China and the Asia-Pacific region, the United States, and the United Kingdom.  (*Id.*)

### B.     Edelson's Background and Experience

Edelson has worked in the investment business for almost thirty five (35) years.  (R. 115-1, Pl.'s Stmt. of Additional Material Facts ("SAMF") at ¶3.)  At the onset of his career, Edelson worked as a research analyst in New York for several securities firms, including Prescott Ball & Turben, Merrill Lynch Pierce, Fenner & Smith, Drexel Burnham Lambert, and First Boston. (*Id.*)  In 1984, Edelson founded Edelson Technology Partners ("ETP") and through that enterprise Edelson has formed and managed five prior investment funds – Edelson Technology Partners I-V (*id.* at ¶4) – that have invested in more than 80 companies in all areas of technology, including information technology, telecommunications, satellite and microwave communications, fiberoptics, genetic engineering, and industrial automation.  (*Id.* at ¶8.)  While at ETP, Edelson has devoted a substantial amount of his time to identifying prospective investors and raising money for these funds.  (*Id.* at ¶6.)  To that end, Edelson called on personal acquaintances and various corporations with which Edelson had contacts, and then explained to

these prospective investors the strategy and objectives of each fund.  (*Id.*)  Investors in these funds consist mainly of major corporations such as AT&T, Viacom, 3M, Ford Motor Company, Cincinnati Bell, and Reed Elsevier, but also include a few partnerships, trusts, and private investors.  (*Id.* at ¶5.)  Under Edelson's management, the funds have returned gains of up to 28%.  (*Id.* at ¶7.)

**C.  Edelson's Association with CDC**

Edelson initially became aware of CDC through his acquaintance, Yip, the CEO of CDC (until 2004) and the current Vice Chairman of CDC's Board of Directors.  (*Id.* at ¶12; R. 96-1, Def.'s SMF at ¶5.)  In the mid to late 1990s, while Edelson was looking for investment opportunities for his venture capital fund, Yip approached him with the opportunity to invest in CDC.  (R. 96-1, Def.'s SMF at ¶7.)  At some point after his fund initially invested in CDC, Edelson joined CDC's board of directors.  (*Id.* at ¶8.)  As part of his compensation for serving on CDC's board of directors, Edelson personally acquired shares of CDC stock and stock options that he subsequently exercised, thereby acquiring additional shares of CDC stock.  (*Id.*)  In July 1999, CDC made an initial public offering (which dramatically increased the value of the ETP fund's investment in CDC), and as a result, CDC became a publicly-held company.  (*Id.* at ¶9; R. 115-1, Pl.'s SAMF at ¶14.)  After CDC went public the ETP fund distributed some, but not all, of CDC's stock to investors in the fund.  (R. 96-1, Def.'s SMF at ¶9; R. 115-1, Pl.'s Resp. to Def.'s SMF at ¶9.)

By Spring 2003, Edelson's relationship with CDC's management had soured.  (R. 115-1, Pl.'s SAMF at ¶15.)  Among other things, Edelson disagreed with Yip and Ch'ien regarding the advisability of CDC expanding a CDC stock buy-back program.  (*Id.*)  On April 16, 2003,

Edelson sent an e-mail to Ch'ien and others stating that corporate governance at CDC was "falling to pieces," that "[t]he voices of independent directors are ignored or abused," and that Yip should be taken up on his offer to resign. (*Id.* at ¶15; R. 120-1, Decl. of Harry Edelson, Ex A.) Edelson's term as CDC director expired at CDC's 2003 Annual General Meeting (held on June 17, 2003), and, although a candidate, Edelson was not re-elected to the board. (R. 115-1, Pl.'s SAMF at ¶¶16, 19.)

### D. The Lawsuits and the Press Release

On October 15, 2003, in the wake of his failed bid for re-election, Edelson filed this suit. On October 28, 2003, CDC filed suit against Edelson in the High Court of Hong Kong alleging that Edelson breached his fiduciary duties and violated CDC's insider trading policies. (*Id.* at ¶¶22, 24.)

On the same day that it filed suit in Hong Kong, CDC informed the investing public of the existence of both complaints in a press release dated October 28, 2003 (the "Press Release") which states in pertinent part:

> [CDC] recently filed a claim in the courts of Hong Kong against former board member, Harry Edelson and his affiliated fund seeking damages related to the alleged breach of fiduciary duties owed to the company and violations of the company's insider trading policy. The company also recently became aware that Mr. Edelson has filed an action against the company and certain board members and one shareholder alleging claims that related principally to his disagreement with the results of this year's annual shareholders meeting whereby he was not reelected by shareholders to the [CDC] board of directors.

(R. 96-1, Def.'s SMF at ¶13.) The Press Release also devoted three and one-half pages to third quarter results, highlights, and key operational developments. (*Id.*) The Press Release is still available on the internet through CDC's website and various other websites. (R. 115-1, Pl.'s SAMF at ¶¶49, 50.)

After CDC issued the Press Release, Edelson amended his complaint to allege an additional theory of tortious interference based on CDC filing the Hong Kong lawsuit and issuing the related Press Release.[1]  In particular, Edelson alleged that, as a result of the Press Release, he has been unable to land a single investor for the Edelson VI fund and that various corporate boards have denied him positions.

**E.     The Effect of the Press Release on Edelson's Ability To Secure Investors**

In August 2003, after losing his bid for re-election, Edelson formed a new philanthropic investment fund dubbed the "Philanthropic Venture Capital Fund No. 1" ("PVC1") and later "Edelson VI."  (R. 115-1, Pl.'s SAMF at ¶35; R. 97-1, Def.'s Exs. in Supp. of Summ. J., Ex. B at 25:10-19.)[2]  Edelson defines the philanthropic aspect of PVC1 as devoting ninety (90) percent of its funds to investments that "would in some way help society" such as providing venture capital to support the development of an AIDS vaccine.  (R. 97-1, Def.'s Exs. in Supp. of Summ. J., Ex. B at 30:7-31:6.)  In an effort to secure investments, Edelson approached approximately three hundred (300) prospective investors.  (*Id.*, Ex. B at 29:1-12, 34:22-24.)  These individuals, however, were not the same type of investors to which Edelson's prior five funds catered.  (R.

---

[1]     The Court has dismissed Edelson's tortious interference claim to the extent it sought damages for the filing of the Hong Kong lawsuit.  *See Edelson*, 2004 WL 422674 at *6 n.10.

[2]     After roughly four months, (*id.*, Ex. B at 34:5-21), Edelson had not received any investment commitments and decided to "discard" PVC1.  (*Id.*, Ex. B at 28:16-24, 34:5-17.)  Thereafter, Edelson abandoned the "philanthropic" goals of PVC1 and relabeled the fund Edelson VI,  marketing it as a fund "going for maximum return without mentioning philanthropy."  (*Id.*, Ex. B at 35:17-36:14.)  Edelson is still attempting to raise money for Edelson VI.  (*Id.*, Ex. B at 37:4-12.)

131-1, Def.'s Resp. to Pl.'s SAMF at ¶4.)[3]

Accordingly, Edelson approached his new pool of investors by "cold calling" prospective investors (something that Edelson had not done before). (R. 115-1, Pl.'s SAMF at ¶39; R. 97-1, Def.'s Exs. in Supp. of Summ. J., Ex. B at 38:18-39-9.) He accumulated lists of people to call by purchasing investor lists from Standard & Poor's, purchasing books that listed those who have money to invest, and researching endowments and pension funds through the internet – all of which Edelson had not done before. (R. 97-1, Def.'s Exs. in Supp. of Summ. J., Ex. B at 38:18-39-9; R. 96-1, Def.'s SMF at ¶18; R. 115-1, Pl.'s Resp. to Def.'s SMF at ¶18.) Of the hundreds of prospective investors he contacted, only about a dozen asked Edelson to make a formal presentation regarding PVC1/Edelson VI. (*Id.*, Ex. B at 40:9-41:18.) After making these presentations, the only further contact Edelson received from prospective investors was "the turndown." (R. 97-1, Def.'s Exs. in Supp. of Summ. J., Ex. B at 41:19-41:24 ("Q: Okay. After you made the presentations to these dozen or so entities, was there any further contact with any of them? A: Except the turndown. Q: Okay. Nothing except the turndown? A: Exactly.").)

---

[3]  Edelson testified to this effect at several points during his deposition. (*See, e.g., id.*, Ex. B at 31:12-22 ("Q: Many of the companies that you had invested in through your prior venture capital funds would have fit the criteria for PVC1? A: No. . . . all of [ETP's] funds have been strategic in nature and they invested in us not so much to make money, they invested in us so that I could help them strategically, and PVC1 was not of that type. PVC1 was to get maximum return. It had nothing to do with helping corporate partners."); *id.*, Ex. B at 73:1-6 (Q: . . . [W]ere there any companies or individuals that you approached to invest in connection with which you'd had a previous business arrangement, previous business dealings? A: No."); *id.*, Ex. B at 73:17-22 ("Q: In connection with Edelson V – I'm sorry Edelson VI, which was the fund you established after PVC1, did you approach any previous investors in any of your other funds to invest in that fund? A: No."); *id.*, Ex. B at 74:12-20 ("Q: But aside from [George Needham], you have not discussed Edelson VI with any previous investor in any of your other funds? A: No, but I mentioned in writing to my investors that I hope to start Edelson VI . . . Q: Have you approached any of them to invest in Edelson VI? A: No.").

Edelson suspects that these entities turned him down because "they Googled us and found out that there was litigation against me for my activities on the board of [CDC]." (*Id.*, Ex. B at 42:18-21.) None of the prospective investors, however, identified the Hong Kong litigation or the Press Release as the reason for their turndown. (*Id.*, Ex. B at 42:1-14; R. 119-1, Decl. of Nicholas Puro ("Puro Decl.") at ¶6; R. 115-1, Pl.'s SAMF at ¶52.) Furthermore, during discovery (undertaken roughly a year ago), CDC served an interrogatory asking Edelson to identify prospective investors in his philanthropic venture capital fund who would have invested in his fund were it not for CDC's Press Release. (R. 96-1, Def.'s SMF at ¶17.) In response, Edelson stated that "it is unknown at this time which prospective investors have decided not to invest in Edelson VI, L.P. as a result of the Press Release. . . [but] [i]nvestigation continues." (*Id.*)

### F. The Declarations in Opposition to Defendant's Motion

To oppose summary judgment, Plaintiff marshals four declarations – his own and those of Gary Yalen ("Yalen"), John W. Allen ("Allen"), and Nicholas J. Puro ("Puro") (collectively the "Declarations"). Each aims, at least in part, to demonstrate that Edelson lost investors as a result of the Press Release.

#### 1. The Yalen Declaration

Yalen is an individual who has known Edelson for over thirty (30) years and worked with Edelson on the Valuation Committee of Edelson Technology Partners from 1985-87. (R. 117-1, Decl. of Gary Yalen ("Yalen Decl.") at ¶¶5-6.) In his Declaration, Yalen avers that he has held various positions within institutional money management and that, as a result, he had to "determin[e] whether money should or should not be placed with particular money managers."

(*Id.* at ¶4.)  Yalen states further that he is "aware of" the Press Release and its contents, but does not describe how or when or why or under what circumstances he became "aware of" the Press Release.  (*Id.* at ¶7.)  In any event, Yalen avers that:

> Based on my years of experience, I believe this accusation of fiduciary malfeasance and insider trading would make it extremely difficult for Mr. Edelson to pass the due diligence process used by institutional investors to select a money manager.  In my prior capacity as the Chief Investment Officer of Fortis, I would not have placed money with a fund manager in the face of statements of the type made in CDC's press release.
>
> The CDC press release would have precluded me from placing funds under Mr. Edelson's management even though I have known Harry Edelson for years and therefore have substantial doubts that the allegations made about him were justified or meritorious . . . .

(*Id.* at ¶¶8-9.)  Yalen does not actually identify an investor who has either read the Press Release or declined to invest in Edelson's fund because of the Press Release.

## 2.    The Allen Declaration

Allen is an individual who has known Edelson for more than twenty (20) years and who considers Edelson to be "one of the most prominent and successful managers in the venture capital community."  (R. 118-1, Decl. of John W. Allen ("Allen Decl.") at ¶2.)  In his Declaration, Allen offers a statement along the same lines as Yalen's:

> Because of my long-standing investment and philanthropic activities, as well as my personal relationships, I am in constant contact with many major institutional investors. Having a high regard for Mr. Edelson and his performance record I have been particularly interested in having these institutional investors take a serious look at Mr. Edelson's new fund, ETP VI, since it is the first one specifically tailored to institutional rather than corporate investors.
>
> However, in conversations about Mr. Edelson, I have been asked if there is anything that might give pause to such an institution participating in the ETP VI Fund.  This is part of the normal due diligence process required by most financial institutions. . . .
>
> In researching this matter I became aware of a press release issued by chinadotcom corporation [ ] dated October 28, 2003.  This press release stated that CDC was suing Mr.

Edelson in the Hong Kong Courts based on allegations that Mr. Edelson had, while he was a CDC director, breached his fiduciary duties to CDC, and had violated CDC's insider trading policy. This accusation of fiduciary malfeasance and insider trading is exactly the type of red flag that prompted the question – as no institution wants to be embarrassed if they make an investment and it is later found out that such a negative situation exists.

As a result of CDC's press release concerning its litigation against Mr. Edelson, I have ceased to recommend an investment in his new fund to any of the investors with whom I am continually in touch. In addition, none of the investment accounts run by me or my family will invest in ETP VI under these circumstances. Collectively, these represent exactly the investment community that is ideally suited to invest in ETP VI and could easily oversubscribe his fund.

I personally feel that this is an extremely damaging accusation, which almost certainly has prevented investment professionals such as myself, from considering or recommending an investment in Mr. Edelson's latest fund.

(*Id.* at ¶¶ 3-7.) Like Yalen, Allen does not actually identify an investor who has read the Press Release or who otherwise would have invested in Edelson's fund but for the Press Release.

### 3. The Puro Declaration

Puro is a partner in several investment funds bearing Edelson's name. (R. 119-1, Puro Decl. at ¶2.) In November 2003, Puro assisted Edelson in attempting to raise capital for a new Edelson venture capital fund. (*Id.* at ¶4.) Puro states that over the past eighteen (18) months, Puro and Edelson attended meetings and conducted conference calls with many "major institutional investors" to present the new fund. (*Id.* at ¶5.) Despite receiving positive initial feedback from prospective investors, Puro avers that he and Edelson failed to secure investors:

[D]uring the due diligence process, the institutional investors that had, during meetings and conference calls, initially expressed excitement about the prospect of investing in a venture capital fund managed by Harry Edelson – who is a respected member of the venture capital community and a former Wall Street "All-Star" analyst – summarily dismissed our new fund as a potential investment. Most of them declined to articulate a reason for doing so. I made numerous attempts to obtain accurate information about why our new fund was rejected, but from the guarded nature of the response I received, I believe that the true reasons were never openly disclosed to me. Most of the time, the

prospective investors would say that they simply were not interested, without further elaboration (even though they had expressed an initial interest and had demonstrated enthusiasm).  Often, the prospective investors put me off by stating that they wanted to see how Edelson VI performed, and they would then consider an investment in an "Edelson VII" fund if and when such a fund were to be formed.  This "logic" is ridiculous considering the successful track record of the Edelson Funds.

In view of the strong track record of the prior funds managed by Harry Edelson and his reputation in the investment community, I found it shocking that we were not able to get any commitments for investment in the new fund from major institutions . . . .

The only factor that I can reasonabl[y] infer precluded the ability to raise money for the new fund was the press release issued by defendant CDC . . . on or about October 28, 2003, in which CDC publicized allegations that Harry Edelson had breached his fiduciary duties as a CDC director, and had violated CDC's insider trading policies.  That press release is easily obtainable through a web search.

(*Id.* at ¶¶6-8.)  Again, Puro, like Yalen and Allen, does not identify any specific investors that

declined to invest in Edelson's funds because of the Press Release.

### 4. The Edelson Declaration

For his part, Edelson offers his own (22-page) declaration in opposition to CDC's motion

for summary judgment.  (R. 120-1, Decl. of Harry Edelson ("Edelson Decl.").)  Edelson

dedicates much of his Declaration to describing his experience as a venture capitalist (*id.* at ¶¶ 4-

14), to recounting the circumstances underlying his failed bid for re-election (*id.* at ¶¶15-28), and

to challenging the merits of the Hong Kong action (*id.* at ¶¶29-43).  But, as is relevant here,

Edelson describes the general fallout after CDC issued the Press Release:

Even though Nick Puro and I had not previously worked from lists to solicit investments from institutions, we were capable of stating a very strong case for investment in the new fund . . . .

It is required that an institution exercise due diligence before placing some of its money with a money manager.  Despite the excellent reception toward an investment in our new venture capital fund that as a result of the initial communications and meeting, prospect after prospect turned us down, and declined to invest in our venture fund despite our exceptional track record. . . .

In view of: (a) the track record of my prior funds; (b) my reputation as a successful money manager and venture capitalist; (c) the initial receptivity shown by may institutions to which the new fund has been presented; and (d) the utter, abject lack of any commitment by any institution to invest in the new fund once the institution has had an opportunity to do its due diligence, I can only conclude that institutions are declining to invest in my new fund because they have become aware of CDC's press release, and through the press release, have become acquainted with CDC's Hong Kong lawsuit.

(*Id.* at ¶¶54, 58, 63.)

Edelson also describes one specific instance where he believes he lost an investor

because of the Press Release:

I had a conversation with Holly Holtz, a representative of TIAA Cref, which may be the largest pension fund in New York. After introducing myself, and telling Ms. Holtz briefly about Edelson VI, she responded that she saw that I had some difficulties with CDC. From the tenor of the conversation, it was clear to me that she was performing an Internet search as we were talking. After that, TIAA Cref expressed no interest in an investment in Edelson VI.

(*Id.* at ¶64.) Edelson testified much to the same effect in his deposition. (R. 97-1, Def.'s Exs. in

Supp. of Summ. J., Ex. B at 148:21-150:17.)[4]

---

[4]     Specifically, the following colloquy took place during Edelson's deposition:

Q: [A]s to that group of people who you did approach to invest in the – your proposed philanthropic fund or Edelson VI, do you have any knowledge that any of those individuals read the press release? A: I have no knowledge, but the recent call to Holly Holtz at TIAA Cref certainly supported my suspicion. Just while I was talking to her in a five-minute conversation, you know, she just mentioned, "I see you have some problems with Chinadotcom."

Q: Did she tell you how she became aware of those problems? A: I just assumed she Googled me while I was talking to her.

Q: Did she tell you that? A: No, but she would have no reason to be investigating me....

Q: And how do you know she hadn't spoken to somebody who you had previously told about the Hong Kong action? A: It's possible, but why would she be thinking about me before the phone call? . . .

### G. The Effect of the Press Release on Edelson's Ability To Serve on Corporate Boards

Edelson's Declaration and deposition testimony is the only evidence Edelson presents in support of his second source of injury: his failure to obtain positions on corporate boards since CDC issued the Press Release. (R. 115-1, Pl.'s SAMF at ¶¶55-58.) During discovery CDC served an interrogatory asking Edelson – a past member of over fifty (50) corporate boards (R. 120-1, Edelson Decl. at ¶65) – to identify the corporate boards that he could have joined but for the Press Release, to which Edelson responded:

> [Edelson] was recommended but not selected to be a director of a large company. This recommendation was made by an acquaintance of Edelson's to the CEO of the public company. It is unknown at this time what other boards Edelson would have been invited to join but for the defendants' wrongful actions as described in the Amended Complaint. Investigation continues.

(R. 97-1, Def.'s Exs. in Supp. of Summ. J., Ex. E at 5.) In his Declaration, Edelson also mentions the instance he referred to in his interrogatory response, stating that in January 2004 Edelson did not receive a board position despite having a lead on one:

> I was approached about my interest in becoming a member of the board of directors of a New York Stock Exchange company called Symbol Technologies, Inc. ("Symbol").[5]

---

> Q: Did she tell you that she was – that [TIAA Cref] would not invest with you because of those problems? A: She did not.

> Q: Is there still a possibility they may invest with you? A: Anything is possible, but very doubtful.

(*Id.*, Ex. B at 148:21-150:17.)

[5]  According to Edelson's deposition testimony, Ms. Paula Newman was the person who recommended Edelson for the position on Symbol's board. (R. 97-1, Def.'s Exs. in Supp. of Summ. J., Ex. B at 127:20-128:16.) Edelson testified that he does not know what connection Ms. Newman has to Symbol Technologies. (*Id.*, Ex. B at 129:9-11.) When asked whether he had any reason to believe she knew about the Hong Kong litigation, Edelson testified: "I doubt

During the time I was considering the opportunity, an email was sent to an attorney at the Skadden Arps law firm and a member of the board of directors of Symbol to look into my background . . . Despite having been recommended to Symbol as a prospective member of their Board, I heard nothing from the company about that possibility. . . .

(R. 120-1, Edelson Decl. at ¶¶66-68; R. 115-1, Pl.'s SAMF at ¶¶56-58.)  The substance of the

email to which Edelson refers reads:

Harry called me today following my email to him.  He would be interested in talking to you.  His coordinates are below:  [listing Edelson's contact information]  Background on him can be gained by going to the website:  edelsentech.com [sic].

(R. 120-1, Edelson Decl., Ex. E.)  Based on this email and the fact that he did not hear back from

Symbol's representative, Edelson concludes that the Press Release prevented him from landing

the board position.  (*Id.* at ¶68 ("Again, I can only attribute that circumstance to CDC's press

release.  I know of no other item in my background that would have a negative affect [sic] on my

ability to even obtain an interview for membership on the Board of Directors of a company."); R.

115-1, Pl.'s SAMF at ¶58 (same).)[6]  Edelson testified that this is the only board position that he

---

that she does."  (*Id.*, Ex. B at 129:17-22.)  Also, Edelson testified that Ms. Newman did not tell him the likelihood of Edelson being elected to Symbol's board of directors.  (*Id.*, Ex. B at 129:12-16.)

[6]     At his deposition, Edelson testified that he draws this conclusion from "a suspicion" (and not any actual evidence that anyone at Symbol technologies read or even heard about the Press Release):

Q:  Have you ever been unsuccessful in any effort to obtain a position on any board of directors or entity or organization?  A.  Well, a good friend of mine recommended me to [the] board . . . [at] Symbol Technologies . . . but they decided not to invite me on the board.

Q:  Why not?  A: I have no idea.  * * *

Q:  Did you have any reason to believe that the reason you weren't selected to be on the board of Symbol Technologies related to the press release?  A:  It's just a suspicion.

has been denied since the Hong Kong litigation commenced.  (R. 97-1, Def.'s Exs. in Supp. of Summ. J., Ex. B at 130:14-17 ("Q:  Is [Symbol Technologies] the only opportunity for a board position that you've been denied since the Hong Kong litigation has been filed against you?  A: Yes.").)

## III.    Tortious Interference

Plaintiff here alleges that CDC, by issuing the Press Release, tortiously interfered with two prospective economic advantages:  (1) Edelson's ability to attract investors to his fund; and (2) Edelson's ability to land a seat on a corporate board.  There is no genuine issue of material fact as to either contention.

"An action for tortious interference protects a business entity's right to pursue its business, calling or occupation free from undue influence or molestation."  *Carpet Group Int'l v. Oriental Rug Imps. Ass'n,* 256 F. Supp. 2d 249, 287-88 (D.N.J. 2003) (citing *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 750, 563 A.2d 31, 36 (1989)) (internal quotation and punctuation omitted).[7]  To succeed on such a claim, a plaintiff must demonstrate: "(1) a reasonable expectation of economic advantage to plaintiff, (2) interference done intentionally and with 'malice,' (3) causal connection between the interference and the loss of

---

Q:  What do you base that suspicion on?  A:  The fact that they didn't want to interview me....

Q:  Did you make any inquiries to find out from Ms. Newman why you weren't selected for the board of Symbol Technologies?  A:  No.

(R. 97-1, Def.'s Exs. in Supp. of Summ. J., Ex. B at 127:21-128:5, 130:6-23.)

[7]      As discussed in the Court's January 28, 2004 Order, the parties agree that New Jersey law applies.  *See Edelson v. Ch'ien*, No. 03 C 7320, 2004 WL 422674, *6, n.9 (N.D. Ill. Jan. 28, 2004).

prospective gain, and (4) actual damages." *Varrallo v. Hammond Inc.*, 94 F.3d 842, 848 (3ᵈ Cir. 1996) (citing *Printing Mart-Morristown*, 116 N.J. at 751, 563 A.2d at 37).[8]  The prospective economic advantage "need not rise to the level of an enforceable contract."  *Patel v. Soriano*, 369 N.J. Super. 192, 242, 848 A.2d 803, 831 (App. Div. 2004).  Rather, this tort "[i]nclude[s] [ ] interferences with the prospect of obtaining employment or employees . . . [or] any other relations leading to potentially profitable contracts."  *Printing Mart-Morristown*, 116 N.J. at 755, 563 A.2d at 39.  In addition, a plaintiff must demonstrate that "there was a reasonable probability that he would have received the anticipated economic benefits."  *Patel*, 369 N.J. Super. at 242, 848 A.2d at 832.

To prove causation, "New Jersey law requires that a plaintiff . . . present proof that *but for* the acts of the defendant, the plaintiff 'would have received the anticipated economic benefits.'"  *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1168 (3ᵈ Cir. 1993) (construing New Jersey law and quoting *Printing Mart-Morristown*, 116 N.J. at 751, 563 A.2d at 37).  Stated differently, a "plaintiff shows causation when there is 'proof that if there had been no interference there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits.'"  *Printing Mart-Morristown*, 116 N.J. at 751, 563 A.2d at 37 (citing *Leslie Blau Co. v. Alfieri*, 157 N.J. Super. 173, 185-86, 384 A.2d 859 (App. Div. 1978)); *see also Dun & Bradstreet Software Services, Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 220 (3ᵈ Cir. 2002) (applying New Jersey law and upholding judgment as a matter of

---

[8]	As the *Varrallo* court recognized, "[a]lthough the New Jersey courts continue to read *Printing Mart*, . . . as setting out a four-part *prima facie* case, several panels of this court have read in a fifth element:  defendant's knowledge of plaintiff's expected advantage."  *Id.* at 848 n.9.  Because CDC has not moved for summary judgment on the "fifth element" the Court need not reach the issue of whether a *prima facie* case requires such a showing.

law on tortious interference claim where plaintiff "failed to produce sufficient evidence to prove that any third parties acted on a letter sent by [defendant]").

### A. Edelson's Ability To Secure Investors

On this issue, Edelson musters his own Declaration as well as three third-party Declarations.[9] As discussed below, Edelson fails to demonstrate that a genuine issue of material fact exists as to whether the Press Release caused him to lose a prospective economic advantage. *See Varrallo*, 94 F.3d at 848 (a claim for tortious interference requires proof of a causal connection between the interference and the loss of prospective gain, among other elements); *see also Dun & Bradstreet*, 307 F.3d at 220.

### 1. The Yalen and Allen Declarations Do Not Create a Genuine Issue of Material Fact

The Yalen and Allen Declarations are not competent summary judgment evidence. Rule 56(e) requires that "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *See also* Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). These Declarations fail to satisfy any of these criteria.

#### a. The Yalen Declaration

In his Declaration, Yalen opines that: (1) "[b]ased on my years of experience, I believe

---

[9] With few exceptions (none of which are relevant to the critical issues in Defendant's summary judgment motion), Plaintiff's Rule 56.1 statement relies exclusively on the substance of the Declarations, (R. 115-1, Pl.'s SAMF at ¶¶31-58), or portions of Edelson's deposition testimony that are substantively the same as the statements in his Declaration, (*see, e.g., id.* at ¶¶48, 56.)

[the] accusation of fiduciary malfeasance and insider trading *would make it* extremely difficult for Mr. Edelson to pass the due diligence process used by institutional investors to select a money manager;" and (2) "[i]n my prior capacity as the Chief Investment Officer of Fortis, I *would not have* placed money with a fund manager in the face of statements of the type made in CDC's press release." (R. 118-1, Allen Decl. at ¶8 (emphasis added).) These statements are pure speculation and conjecture. They fail to establish that Yalen has personal knowledge that CDC's allegations made it extremely difficult for Edelson to pass due diligence (but only that he thinks it would have made it difficult) or that he personally knows that investors refrained from contributing to Edelson VI because of the Press Release[10] (but only that he would have refrained if he were still the CIO of Fortis[11]).

In addition, Yalen has provided what is, at best, expert testimony regarding the supposed consequences of the Press Release. Edelson never disclosed Yalen as an expert and he has failed to demonstrate Yalen's competency to testify as such. Without personal knowledge or demonstrable competency as an expert, Yalen's affidavit is improper under Fed. R. Civ. P. 56(e). *See also* Fed. R. Evid. 602; *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) ("evidence relied upon [at summary judgment] must be competent evidence of a type otherwise admissible at trial").

### b. The Allen Declaration

Allen's Declaration fairs no better. Allen never expressly states he has personally

---

[10] The remainder of Yalen's Declaration similarly fails to demonstrate that he has personal knowledge of the facts at issue here.

[11] As of December 2002, Yalen no longer holds this position. (R. 117-1, Yalen Decl. at ¶3.)

refused to invest (or that he knows of someone who actually refused to invest) because of the Press Release. Instead he dances around the issue likely in hopes that he will create the impression that such is the case. For example, he states that "he has been particularly interested in having [ ] institutional investors take a serious look at Mr. Edelson's new fund." (R. 118-1, Allen Decl. at ¶3.) But, notably, this statement does not say that Allen *has actually had* institutional investors look at Mr. Edelson's new fund. The following paragraph is similarly deficient: "in conversations about Mr. Edelson, I have been asked if there is anything that might give pause" to investing in Edelson's new fund. (*Id.* at ¶4.) This statement is vague and ambiguous in that it does not say with whom Allen had these conversations, or who asked him about what might "give [him] pause."[12] Next, Allen states that "[i]n researching this matter I became aware of a press release issued by [CDC]," but conspicuously absent from this statement is information about when he researched this matter, why he researched the matter, and for whom. (*Id.* at ¶5.) Then, Allen says that he has "ceased to recommend an investment in

---

[12]    Allen phrases this critical averment in the passive voice, thereby obscuring whatever concrete facts he might have related. *See, e.g., Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1296 (11th Cir. 2002) (using passive voice "[led] to unnecessary confusion and obfuscation" and that "[a]s a result of this passive narrative, the pleader does not make explicit – perhaps by a conscious, tactical choice – whose debt to LIT was being secured by the Members' pledges"). For this added reason, the Allen Declaration does not help Edelson avoid summary judgment. *See, e.g., Peterson v. Wilmur Comm., Inc.*, 205 F. Supp. 2d 1014, 1025 (E.D. Wis. 2002) (employment discrimination case where district court granted plaintiff's motion for summary judgment on liability after finding that affidavits did not satisfy Rule 56(e) and did not create a genuine issue of fact, in part, because non-movant's "statement is phrased in the passive voice and does not actually say that any employee complained about plaintiff"); *Adkins v. United Mine Workers of Am.*, 61 F.3d 903, 1995 WL 441630, *5 (6th Cir. 1995) (affirming summary judgment because affidavits in opposition thereto "are in the passive voice and do not name any entity or individual as being responsible for the alleged wrongdoing . . . [t]he affidavits simply do not provide any evidence that these defendants. . . made any misrepresentations . . .") (unpublished decision).

[Edelson's] new fund . . ." and that "none of the investment accounts run by me . . . will invest in ETP VI under these circumstances." (*Id.* at ¶6.) But these statements similarly fail to establish that Allen actually knows of an investor who otherwise would have invested in Edelson's fund but for the Press Release, or that he knows of an investor who read or was aware of the Press Release. As a result, the Allen Declaration fails to demonstrate that Allen has personal knowledge regarding any facts at issue here and, thus, it fails to satisfy the requirements of Rule 56(e). *See also* Fed. R. Evid. 602; *Drake*, 134 F.3d at 887 ("While the Drakes argue that Shevely's long tenure at 3M's plant qualifies him to make the assertions contained in his affidavit, this argument misapprehends Rule 56(e)'s requirements. Instead, Sheveley's affidavit should have recounted factual instances, based upon Sheveley's personal knowledge, that demonstrated Dean Coleman's tendency to 'cover up' matters. Without these substantiating facts, under Rule 56 we cannot make the reasonable inferences that the Drakes assert militate against summary judgment.").

Moreover, like the Yalen Declaration, the Allen Declaration amounts to improper expert testimony. (*See, e.g., id.* at ¶7 ("I personally feel that this is an extremely damaging accusation, which almost certainly has prevented investment professionals such as myself, from considering or recommending an investment in Mr. Edelson's latest fund.").) The only permissible way for Edelson to have introduced expert testimony would have been through Rule 26's expert disclosure requirements – something that Edelson failed to do.[13]

---

[13]     Edelson did not disclose Yalen and Allen as persons likely to have discoverable information until he served his supplemental Rule 26(a)(1) disclosures on August 23, 2005 – the day after Edelson filed his opposition to CDC's Motion. (R. 129-1; Def.'s Reply in Supp. of Summ. J. at 1-2.)

## 2. The Remaining Evidence Does Not Create a Genuine Issue of Material Fact

Edelson otherwise fails to identify a genuine fact issue as to whether CDC interfered with a prospective business advantage.[14]

### a. The General Effect of the Press Release

First, save one exception (discussed below), Edelson does not identify any specific entities that allegedly failed to invest in PVC1/Edelson VI because of the Press Release. Instead, Edelson merely speculates as to why prospective investors have given him the cold shoulder. His contention essentially boils down to this: in light of (1) his track record, (2) his reputation, (3) and the "initial receptivity shown by many institutions," the only possible reason he could have failed to secure investors for PVC1 and Edelson VI is CDC's issuance of the Press Release.[15] (R. 120-1, Edelson Decl. at ¶¶58, 63 (stating that Edelson "can only conclude that

---

[14] Even though Edelson did not disclose Puro as a potential witness before offering Puro's Declaration in opposition to summary judgment, the Court will not strike the affidavit for that reason despite CDC's request to the contrary. Edelson, in his deposition testimony, referred to his collaborative efforts with Puro. (R. 97-1, Def.'s Exs. in Supp. of Summ. J., Ex. B at 39:19-21 ("Q: And who made these phone calls to these hundreds of [potential investors]? A: Nick Puro and myself.").) Thus, CDC was effectively on notice that Puro could have relevant testimony and exclusion on that basis would be improper. *See, e.g., Sunkett v. Misci*, 183 F. Supp. 2d 691, 704 (D.N.J. 2002) (declining to exclude affidavit even though affiant was not disclosed in discovery because previous deponents had indicated that the undisclosed witness would have relevant testimony); *see also Nance v. Friedman*, No. 98 C 6720, 2000 WL 1700156, *2 n.1 (N.D. Ill. Nov. 8, 2000) (refusing to strike affidavit of undisclosed witness in part because the opposing party was aware of how that witness would testify). As described below, however, Puro's Declaration fails to create a genuine issue of material fact.

[15] Elsewhere in his Declaration, Edelson states that he received an "excellent reception toward investment in our new venture capital fund." (R. 120-1, Edelson Decl. at ¶58.) But Edelson's characterization is belied by his previous deposition testimony in which he testified that of approximately 300 hundred calls, only about a dozen prospective investors asked Edelson to make a follow-up presentation. (R. 97-1, Def.'s Exs. in Supp. of Summ. J., Ex. B at 40:9-41:18.)

institutions are declining to invest in [his] new fund because they have become aware of CDC's press release...").)

Other than Edelson's speculation, however, there is nothing to sustain his claim that but for the Press Release he would have gained a prospective economic advantage. Edelson simply fails to provide proof of causation. For one thing, Edelson and Puro both admit that, despite being asked, no prospective investor ever stated that he or she declined to invest because of the Press Release or the Hong Kong litigation more generally. (R. 119-1, Puro Decl. at ¶6-7 ("Most [investors] declined to articulate a reason for [not investing]. I made numerous attempts to obtain accurate information about why our new fund was rejected, but from the guarded nature of the response I received, I believe that the true reasons were never openly disclosed to me."); R. 97-1, Def.'s Exs. in Supp. of Summ. J., Ex. B at 42:1-14.)

More importantly, Edelson does not offer any evidence from which the Court can reasonably infer that any potential investor actually read the Press Release or refused to invest because of the Press Release. Indeed, Edelson testified unequivocally that he had no evidence that anyone has read the Press Release. (R. 97-1, Def.'s Exs. in Supp. of Summ. J., Ex. B at 111:1-11 ("Q: Do you have any – any evidence of any kind that anyone did not invest in the philanthropic fund you intended to establish because they had read about or heard about the press release? A: No."), 148:21-149:2 ("Q: [A]s to that group of people who you did approach to invest in the – your proposed philanthropic fund or Edelson VI, do you have any knowledge that any of those individuals read the press release? A: I have no knowledge . . ."); *see also id.* at 149:8-14 (Edelson testifying that Ms. Holtz did not tell him how she learned of Edelson's "difficulties with" CDC).)

Edelson's failure to come forward with more at this stage is fatal. *See Lucas v. Chicago Transit Authority*, 367 F.3d 714, 726 (7th Cir. 2004) ("We repeatedly have held that conclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment."); *see also Dun & Bradstreet*, 307 F.3d at 220 (upholding judgment as a matter of law because plaintiff did not provide sufficient evidence that anyone had acted on a supposedly tortious statement); *Pitney Bowes, Inc. v. Executive Credit Corp.*, No. B-89-443, 1990 WL 150448, *2 (D. Conn. Sept. 26, 1990) (allegation that party tortiously interfered with all business relations was sufficient to survive motion to dismiss, but "[i]f after discovery, it appears that there has been no relationship . . . . interfered with, [that party] may well have grounds for summary judgment. . ."). Stated differently, Edelson's desired inference – that (unidentified) investors must have read the Press Release and thereafter forestalled their willingness to invest in Edelson's fund – is not a reasonable one[16] to which he is entitled on summary judgment, but rather is only speculation. *See Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928, 931-32 (7th Cir. 1995) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (emphasis original)); *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001) ("[t]o divine from the known facts the conclusion [necessary to avoid summary judgment] would require us not to draw a reasonable inference in [the non-movant's] favor, as we are required to do in reviewing an order of summary judgment, but to engage in speculation. It is well-settled that speculation may not be

---

[16]     Edelson's speculation as to the supposed state of mind of potential investors, Edelson is not sufficient to defeat summary judgment. *See Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999) ("[b]ecause a plaintiff's speculation is not a sufficient defense to a summary judgment motion [plaintiff's] speculation about what [another party] *might* have believed does not create a genuine issue of fact" (emphasis original)).

used to manufacture a genuine issue of fact.").

### b. TIAA Cref

Edelson identifies one entity – TIAA Cref – that he claims failed to invest in his funds because to the Press Release. Edelson, however, only offers but one purely speculative link between the Press Release and TIAA Cref's failure to invest: that "from the tenor of the conversation [with Ms. Holtz], it was clear to [him] that [Ms. Holtz] was performing an internet search as we were talking." (R. 120-1, Edelson Decl. at ¶64; R. 115-1, Pl.'s SAMF at ¶48; R. 97-1, Def.'s Exs. in Supp. of Summ. J., Ex. B at 150:8-17 ("Q: Did [Ms. Holtz] tell you how she became aware of those problems? A: I just assumed she Googled me while I was talking to her. Q: Did she tell you that? A: No, but she would have no reason to be investigating me . . . .").)[17] Even if Ms. Holtz were conducting an internet search on Edelson, there is nothing in the record to support the inference that she *found the Press Release* when doing so.[18] Furthermore, Edelson

---

[17] Based on the current record, it appears that Edelson did not direct discovery to Ms. Holtz or TIAA Cref to confirm his speculation that TIAA Cref failed to invest in his funds because of the Press Release.

[18] For instance, in both his deposition testimony and in his Declaration, Edelson testified that Ms. Holtz said "I see you have some difficulties with [CDC]," but there is no indication that she was referring to the Hong Kong litigation as described in the Press Release. If she was referring to Edelson's decision to bring suit against CDC, or to Edelson's failed attempt to be re-elected to CDC's board, or to some other mention of the Hong Kong litigation other than the Press Release, Edelson would not have a claim against CDC. *See Lightning Lube*, 4 F.3d at 1168 ("New Jersey law requires that a plaintiff . . . present proof that *but for* the acts of the defendant, the plaintiff 'would have received the anticipated economic benefits.'"); *see also Edelson*, 2004 WL 422674 at *6 n.10 (holding that Edelson cannot bring a claim of tortious interference based on the existence of the Hong Kong litigation itself). Moreover, Ms. Holtz's statement – to the extent it is used to establish the truth of the matter asserted – constitutes inadmissible hearsay and thus is not competent summary judgment evidence. *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) ("hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial"); *Bombard*, 92 F.3d at 562 ("a party may not rely upon inadmissible hearsay . . . to oppose a motion for summary judgment").

likewise fails to provide any evidence that Ms. Holtz was willing to invest or would have invested in Edelson VI but for the Press Release.

In the case of TIAA Cref, like investors generally, the Court must grant summary judgment because Edelson seeks an inference that goes well beyond the reasonable inferences he is entitled to on summary judgment. Edelson puts forth only his own speculation as to why Ms. Holtz or TIAA Cref did not invest, thereby falling well short of his summary judgment burden. *See, e.g, Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000) (Plaintiff non-movant pointed to one affidavit to demonstrate material fact issue "[b]ut without supporting facts or explanatory details, this 'perception' is merely speculation regarding [defendant's] motives and cannot defeat summary judgment." (internal citation omitted)). Conversely, to deny summary judgment here would merely "replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000) (quoting *LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 920 (7th Cir. 1997)).

## B. The Opportunity To Serve on Corporate Boards

Edelson also fails to put forward evidence from which the Court can reasonably infer that the Press Release has prevented him from serving on corporate boards. Edelson contends that he failed to earn a spot on Symbol's board of directors because of the Press Release. On this issue, Edelson again offers only his own speculation in support of his claim. (R. 120-1, Edelson Decl. at ¶¶66-68; R. 115-1, Pl.'s SAMF at ¶58 (based upon "hear[ing] nothing from [Symbol] about [the] possibility," "Edelson can only attribute [his failure to serve on the Symbol's board of directors] to CDC's press release. Edelson knows of no other item in his background that would have a negative affect on his ability to even obtain an interview for membership on the Board of

Directors of a company.").  Edelson is missing specific facts to support his conclusion.[19]  *See*

*Drake*, 134 F.3d at 887 ("Rule 56 demands something more specific than the bald assertion of

the general truth of a particular matter, rather it requires affidavits that cite specific concrete

facts establishing the existence of truth of the matter asserted.").  Indeed, Edelson's own

testimony confirms that he has no evidence whatever that anyone at Symbol Technologies knew

about or read the Press Release, or that the Press Release was the reason why Symbol did not

interview with Edelson.  He testified in his deposition that he has "no idea" why Symbol did not

invite him to its board of directors (R. 97-1, Def.'s Exs. in Supp. of Summ. J., Ex. B at 127:21-

128:5)[20] and that he has no real basis for concluding that Symbol acted based on the Press

Release:

> Q:  Did you have any reason to believe that the reason you weren't selected to be on the
> board of Symbol Technologies related to the press release?
>
> A:  It's just a suspicion.
>
> Q:  What do you base that suspicion on?
>
> A:  The fact that they didn't want to interview me . . . .

(R. 97-1, Def.'s Exs. in Supp. of Summ. J., Ex. B at 127:21-128:5, 130:6-23; s*ee also id.*, Ex. E

at 5 (Edelson's interrogatory response wherein Edelson stated that "It is unknown at this time

---

[19]    The Court notes that during the course of discovery Edelson had ample
opportunity to obtain discovery from Symbol to confirm his suspicion that Symbol did not
interview him because of the Press Release.

[20]    Other factors further attenuate causation.  Edelson testified that Ms. Newman –
the person who recommended Edelson to Symbol – did not even know about the Hong Kong
litigation.  (*Id.*, Ex. B at 129:17-22.)  Furthermore, Ms. Newman directed her contact at Symbol
to obtain background on Edelson by going to Edelson's own website, not CDC's website or any
other website posting the Press Release.  (R. 120-1, Edelson Decl., Ex. E.)

what other boards Edelson would have been invited to join but for the defendants' wrongful actions...).)  On this evidence, the Court cannot conclude that there is a genuine issue of material fact as to causation.  At the summary judgment stage, Edelson must produce more than just speculation.  *See Gorbitz*, 196 F.3d at 882; *Jordan*, 205 F.3d at 343.

## CONCLUSION

For the above stated reasons, the Court grants CDC's motion for summary judgment.

Dated: November 9, 2005                                    ENTERED


_____
AMY J. ST. EVE
United States District Judge